**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| OZMO LICENSING LLC,<br><br>      Plaintiff,<br><br>    v.<br><br>ACER INC. and<br>ACER AMERICA CORP.<br><br>      Defendants. | Case No. 6:21-cv-01225-ADA<br><br><br><br>**JURY TRIAL DEMANDED** |

**ACER'S REPLY CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................................. 1

II. DISPUTED TERMS .............................................................................................................. 1

    A. "logic for processing/logic for generating" ............................................................... 1

        1. These terms are means-plus-function terms. ................................................ 1

        2. Ozmo's identified structure is incorrect. ...................................................... 3

    B. "Logic for initiating and maintaining wireless network connection." ........................ 4

    C. "Data forwarding logic" .............................................................................................. 5

    D. "First [wireless] network/second [wireless] network" ............................................... 5

    E. "Overlay protocol" ...................................................................................................... 6

    F. "Partially consistent/partially compliant" ................................................................... 8

    G. "Configured to agree/can agree/mutually agreeable." .............................................. 10

    H. "Personal Area Network" ......................................................................................... 11

    I. "At least partially disable the wireless connection" ................................................. 13

## TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018) ................................................................................................ 8

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364, 1371 (Fed. Cir 2014) ....................................................................................... 8

*Sonrai Memory Ltd. v. Oracle Corp.*
  2022 WL 800730 (W.D. Tex. March 16, 2022) ....................................................................... 1

*U.S. Well Services, Inc. v. Halliburton Co.*,
  2022 WL 819548 (W.D. Tex. Jan. 17, 2022) ........................................................................... 8

*Dyfan, LLC v. Target*
  28 F.4th 1360 (Fed Cir. 2022) ............................................................................................. 2, 3

**Statutes**

35 U.S.C. § 112 ....................................................................................................................passim

I.  **INTRODUCTION**

The asserted claims are indefinite, and Ozmo's responsive claim construction brief does nothing to provide clarity or otherwise identify an objective boundary to specify the changes that are necessary to make the overlay protocol "partially compliant" with the primary network. Acer's constructions are consistent with the intrinsic record and should be adopted.

II.  **DISPUTED TERMS**

   A.  **"Logic for processing/logic for generating"**

   1. **These terms are means-plus-function terms**[1]

The parties dispute whether the "logic for" terms should be construed as "means-plus-function" limitations and construed pursuant to Section 112(6). The intrinsic record here is clear. These terms recite no structure, and the prosecution history of the '814 patent, along with a comparison to the asserted claims from the '991 patent, demonstrate that these claim terms should be given the meaning provided by the intrinsic record – that these "logic for" terms are "means-plus-function" terms subject to construction under Section 112, paragraph 6.

Ozmo mischaracterizes Acer's argument as contending that the use of "logic" is always a nonce word. Ozmo Responsive Br. at 4-5. Having set up the strawman, Ozmo recites a laundry list of authority to support its argument that "logic for" does not always trigger application of section 112, paragraph 6. Ozmo relies primarily on a recent decision from this district for this point. *Sonrai Memory Ltd. v. Oracle Corp.* 2022 WL 800730 (W.D. Tex. March 16, 2022).

But Acer's argument was not that "logic for" should be treated as a means-plus-function limitation in all cases. Acer's Opening Br at 4-8. Instead, Acer argued that in this case, the totality of the evidence, in particular the lack of structure in the claim, the prosecution history, and the fact

---

[1] Both parties appear to agree that these limitations present the same legal and factual issues for construction, and so Acer addresses them jointly here.

that the '991 patent claims are identical to the '814 patent claims except for the "logic for" language, compels that conclusion. Acer Opening Br. at 4-8. As explained in Acer's opening brief, the overall prosecution strategy for the patent portfolio, including the '814 and '991 patents-in-suit, demonstrates that Ozmo was engaged in developing a patent portfolio with various claim types, and this included the '814 patent, which uses the disputed "logic for" limitations that were – based on the prosecution history – intended to be means-plus-function claims. *Id.*

Acer's approach is consistent with Ozmo's cited authority. For example, Ozmo relies on the Federal Circuit's *Dyfan* decision to provide guiding principles and argues that "Acer's argument conflicts with the legal principles articulated throughout Dyfan." Ozmo Responsive Br. at 5. Not so. In *Dyfan*, the Federal Circuit explained that "[I]ntrinsic evidence, such as the claims themselves and the *prosecution history,* can be informative in determining whether the disputed claim language recites sufficiently definite structure or was intended to invoke § 112 ¶6." 28 F. 4th at 1365-66(emphasis added). As Acer has explained, the intrinsic record, and particularly the prosecution history, support the conclusion that these terms should be construed as means-plus-function terms. Acer Opening Br. at 4-8. Thus, Acer's argument is entirely consistent with the principles that the Federal Circuit articulated in *Dyfan*.

Moreover, the facts of *Dyfan* are dramatically different from those here. In *Dyfan,* the Defendant contended that the code/application limitations were means-plus-function limitations and lacked sufficient structure. 28 F.4th at 1364. The Federal Circuit found that this was not a means-plus-function limitation in large part because *Defendants' expert*, Dr. Goldberg, provided undisputed testimony that a person of ordinary skill in the art would have understood the disputed limitation as a particular structure, and that the term "code" when coupled with language describing its operation, connotes structure. *Id.* at 1367-68. No such testimony from Defendants'

expert is in the present record, and thus *Dyfan* does not support Ozmo's argument that the disputed limitations are not means-plus-function terms.

Ozmo's citations to the specification do not demonstrate that the "logic for" terms recited in the claim reflect the necessary specific structure. Indeed, the citations do not refer to the use of "logic for generating" or "logic for processing" – both of which recite the function and nothing else. Instead, Ozmo points to the use of "logic" in other contexts to try to bootstrap sufficient structure into these terms. But this does not cure the lack of structure for these limitations, and Ozmo's argument should be rejected, and the terms treated as means-plus-function limitations.

### 2. Ozmo's identified structure is incorrect

In its Responsive Brief, Ozmo identifies corresponding structure for performing the claimed function. Ozmo Responsive Br. at 3 (logic for processing) and 8 (logic for generating). Ozmo's proposed structures should be rejected, as they are inconsistent with the specification's disclosure of the claimed hub.

Acer and Ozmo agree that the corresponding structure should include processor 28 and software platform 36 as components of the corresponding structure. Acer Opening Br. at 4 and 9; Ozmo Responsive Br. at 3 and 8.  The parties disagree whether the corresponding structure should also include the wireless circuit 19 and operating system 37.

Wireless circuit 19 cannot be part of the corresponding structure because wireless circuit 19 is not part of the claimed "wireless enabled hub."  Figure 6 and the corresponding text show the structure of the wireless enabled hub, and do not contain wireless circuit 19. ECF 26-1 (Ex. A) '814 Patent, Fig. 6; col. 6:49-7:10. Instead, wireless circuit 19 is part of a PS-STA – defined by the '814 patent as a "power sensitive station," and illustrated in Figure 5. *Id*. at Fig. 5, Col. 5:19-22. These PS-STAs are the battery-operated structures also referred to as PERs that are connected to the hub using the WPAN. Ozmo's identification of structures outside the hub should be rejected.

3

With respect to the operating system, the specification describes this as an optional feature of the wireless hub, and thus it should not be included as part of the corresponding structure. ECF 26-1 (Ex. A) '814 Patent, col. 7:12-16. The Court should adopt Acer's proposed structure.

### B.     "Logic for initiating and maintaining wireless network connection"

This is a means-plus-function term for the same reasons set forth above in Section A, and Ozmo largely incorporates its prior arguments made for the "logic for generating/processing terms." Ozmo Responsive Br. at 9. Ozmo further argues that the length of this claim limitation provides sufficient structure. *Id.* (referencing the 122 words in the limitation). But length alone does not justify a different result. The longer clause merely describes the function in more detail: it explains what the logic does, but does not include any structural elements.

Again, Ozmo now identifies a corresponding structure for this limitation. Ozmo's corresponding structure should not be adopted.

First, as with the "logic for generating/processing" limitations, Ozmo is mixing and matching components from different device. Once again, Ozmo is taking components from the claimed hub and the unclaimed PS-STAs and contending that they should be part of the structure for the wireless hub. Thus, for the reasons set forth above in Section II.A.2, Ozmo's construction is inconsistent with the disclosed devices and should be rejected.

In addition, Ozmo identifies additional elements that are not structure, and should not be incorporated into any corresponding structure for this term. Ozmo cites Figures 11 and 12, but these figures simply show timing diagrams for coordinating transmission times for networks that include multiple PERs, and do not relate to the initiating or maintaining of the wireless network.

Acer has no issue with including the "device discovery" procedures set forth in col. 13:16-14:27 being included as part of software 36, since they relate to initiation of the wireless network.

4

### C.     "Data forwarding logic"

This is a means-plus-function term for the same reasons set forth above in Section A.

As with the other "logic for" terms, Ozmo has now proposed an identified function and corresponding structure. Acer has no issue with Ozmo's formulation of the claimed function, and in the interest of reducing disputes for the claim construction hearing is willing to adopt that formulation of the claimed function.

With respect to the proposed structure, Ozmo's proposed structure again mixes and matches components from different devices into the claimed structure. This is even more problematic here, as the claimed function is routing data from a node in one network to a node in the other network, and the only disclosed device that does this is the hub shown in Figure 6 and described in the corresponding text. ECF 26-1 (Ex. A) '814 Patent, Fig. 6, col. 6:49-7:2.  Acer's proposed construction should be adopted

### D.     "First [wireless] network/second [wireless] network"

The claims and the specification make it clear that the two wireless networks are distinct – that is different. Ozmo argues that the networks must "overlap" because they have a common node. Ozmo Responsive Br. at 12. But this does not justify rejection of Acer's construction, because the network enabled hub can run two different wireless networks, and indeed, that is precisely what the specification describes. ECF 26-1 (Ex. A)'814 Patent, col. 4:66-5:10; Ozmo Responsive Br. at 12 (describing two networks – a WLAN using a first protocol and a WPAN using a different protocol).

Because the specification makes clear that the two networks are distinct, or different, the Court should adopt Acer's proposal.

### E. "Overlay protocol"

Ozmo presents a new construction for the term overlay protocol: "a protocol governing a second network, which protocol has aspects in common with a first network protocol to reduce interference such that the second and first networks can co-exist." Ozmo Responsive Br. at 12. Ozmo contends that there should be "no mystery" as to the meaning of this term based on the intrinsic evidence (Ozmo Responsive Br. at 13)–yet this apparently clear construction did not occur to them until they prepared their responsive brief.

Ozmo's new construction should be rejected, as it effectively collapses the terms "overlay protocol" into the disputed "partially compliant" terms via its definition. Ozmo's attempts to define an overlay network imports the ambiguity found in the "partially compliant" limitation into this claim by using the term "aspects in common," which is no clearer than the "partially compliant/consistent" language found in the disputed claims. Indeed, Ozmo appears to recognize this fact. Ozmo Responsive Br. at 16.

Ozmo's citations to the common specification do not support its construction. Ozmo cites to the only paragraph in the specification that uses the term "overlay protocol. Ozmo Responsive Br. at 13, citing ECF 26-1 (Ex. A) '814 patent, col. 9:60-10:3. Far from "defining" the meaning of the term, this paragraph simply identifies that an "overlay" network is something that provides "coordination." The specification does not explain the nature of the secondary network beyond the fact that it might provide "coordination" with the WLAN. *Id.*

The proposed construction introduces additional ambiguity by requiring "reduced interference" without specifying the nature of the interference, or how the interference reduction should be achieved. Is the interference to be reduced in the first protocol, the overlay protocol or both? How is it measured? The common specification is silent as to this point and provides no objective boundaries for measuring the interference or its reduction.

Indeed, in the cited excerpt from the common specification, the SWN protocol (i.e., the alleged "overlay protocol") is used in a manner that is described as "without interference from the conventional WLAN" (i.e., the underlying network). This excerpt does not say the overlay protocol "reduces interference such that the second and first networks can co-exist," as Ozmo's proposed construction asserts. It does not explain how an additional protocol, overlay or not, can reduce the interference that exists within the conventional WLAN. To the contrary, by having "aspects in common," it could increase the interference with the underlying network protocol since certain devices in the underlying network (e.g., STA1 and STA 4 in Fig. 8 of the '814 patent) operate in both the underlying network and the overlay network, and they may get confused when the overlay protocol communicates with these devices in aspects in common.

Vleugels I also does not support this construction or provide certainty to it. Like the common specification, Vleugels I citations reflect the use of an 802.11x protocol, along with some undisclosed modifications to that protocol that might permit it to co-exist with the WLAN and avoid interference. But the only guidance provided is to use different frequency bands or channels for transmission, or to schedule transmissions for specific time slots. ECF 26-8 (Ex. H) '613 Patent col. 15:4-19. The citation to the abstract of Vleugels I (Ozmo Responsive Br. at 13), or col. 15:56-16:6 also do not support Ozmo's construction, since they reflect that the WLAN device will still have to hear, receive, and process some portion of a WPAN transmission, even if they ultimately ignore the protocol frame. This thus does not necessarily reduce interference in the WLAN or clarify how that should be done.

Finally, applying a construction that includes interference reduction broadly would improperly import a specific embodiment already recited in the narrower asserted claims. For example, claim 1 of the '934 patent specifically defines the partially compliant overlay network as

7

existing without interference with the main network: "wherein the WPAN protocol is an overlay protocol that is partially compliant with respect to the WLAN protocol such that said usage occurs without interference from the WLAN." ECF 26-4 (Ex. D) '934 Patent, claims 1, 4 and 7. *See also*, ECF 26-5 (Ex. E) '506 patents, claims 1, 4 and 7 (same). The remaining claims do not include any reference to interference, its elimination or reduction. *See, e.g.,* ECF 26-1 (Ex. A) '814 patent, claim 1 ("wherein the second wireless network protocol is an overlay protocol with respect to the first wireless network protocol in that communications using the second wireless network protocol are partially consistent with the first wireless network protocol"); ECF 26-1 (Ex. B) '991 patent, claims 1 and 19 (same language); ECF 26-3 (Ex. C) '906 patent, claims 1 and 4 ("WPAN protocol is an overlay protocol that is partially compliant with respect to the WLAN protocol such that the WPAN protocol uses a WLAN protocol frame adapted to support a WPAN power-saving protocol that is different as compared to a power-saving protocol supported by the WLAN protocol."). The Court should not import a non-interference limitation into claims that clearly lack it, and thus, the Court should not adopt Ozmo's proposed construction.

Acer's proposed construction for the term overlay protocol is consistent with the usage of the term in the art and should be adopted.

### F. "Partially consistent/partially compliant"

Fundamentally, the specification at issue does not define what it means for the second network or WPAN to be partially consistent with the first network or WLAN. As explained in Acer's opening brief, the claim language itself lacks guidance, and sufficient certainty cannot be gleaned from the specification.

Ozmo's proposed construction – "conforming to only part of" – cures none of these deficiencies, as it provides no guidance as to when a particular protocol is partially compliant. Neither Ozmo's construction nor its efforts to explain the changes provide the required objective

8

boundaries necessary to make the claims definite. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1363 (Fed. Cir. 2018); *U.S. Well Services, Inc. v. Halliburton Co.*, 2022 WL 819548, at *4 (W.D. Tex. Jan. 17, 2022) ("When a term of degree is used in a claim, 'the court must determine whether the patent provides some standard for measuring that degree.'"). "The standard must 'provide objective boundaries for those of skill in the art.'" *Id.* at *4, citing *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir 2014). Indeed, like the patent owner in *U.S. Well Services*, Ozmo seems to be arguing that "if it works" then it falls within the scope of the claims. *Id.* at 9. But this is not an issue of breadth but rather one where the term specifies no boundaries and is thus indefinite.

Ozmo argues that Acer's argument is "stillborn" because the modified protocol would comport to only part of that protocol. Ozmo Responsive Br. at 15. Ozmo misses the point – the problem with the claim, and a problem not cured by the specification – is that the specification provides no details about the nature of the modifications needed to provide a sufficiently objective boundary to the claim.

To argue that this term is not indefinite, Ozmo cites portions of the specification and Vleugels I that refer to generic categories of modifications. Ozmo Responsive Br. at 17-18. But these block quotes say nothing about the nature of the changes that might make a network partially compliant – instead, speaking in abstract concepts to select a suitable design that has "many aspects in common" without identifying what or how the aspects have been changed. *Id.* These disclosures thus do not provide "objective boundaries" for those skilled in the art, nor do the claims.

This lack of disclosure is even more problematic for the claims that do not identify the base protocol being used. Identification of generic changes that can be made to the 802.11x protocol is insufficient to provide "objective boundaries" with respect to the overlay protocol in the category

9

one claims – those claims that recite no specific first wireless protocol. For these claims the overlay protocol must be "partially compliant" with an unidentified first protocol, and the nature of the partial compliance in undefined in the claims. A person of ordinary skill is left without reasonable guidance as to the claim scope. Pointing to non-specific modifications made to one type of WLAN protocol does not cure these deficiencies where the claim is not so limited.

To the extent that Ozmo is arguing that the "elimination of interference" between the first and second network is some sort of objective guidepost (Ozmo Responsive Br. at 20) for the category I claims or others, this disclosure also fails to provide objective boundaries to the claim, for the reasons set forth above in section II.E. Likewise, this should be rejected because the applicants could have defined the invention this way in the challenged claims – but for most claims at issue, they did not, as discussed above in section II.E. The Court should not use the elimination of interference to provide the needed clarity for claims that do not include that requirement as part of the claim language.

In sum, whether the Court considers this limitation on its own, or in conjunction with the "overlay network" limitation, the claims simply lack the necessary precision under *Nautilus* and its progeny and are invalid as indefinite.

### G.   "Configured to agree/can agree/mutually agreeable."

The parties' dispute over this term comes down to whether the hub can unilaterally dictate inactivity times, or whether the hub and the second wireless device must agree to a specific inactivity time. The Court should adopt Acer's proposed construction and reject Ozmo's.

Ozmo's proposal that agreement can include an inactivity time dictated by the hub is inconsistent with normal concepts of agreement, which reflect reaching a common ground or understanding. This is particularly true as to the claims that refer to a "mutually agreeable" act, since an act ordered by the hub cannot be realistically said to be mutually agreeable.

The specification also supports Acer's construction, since the only use of the term "agree" or "agreeable" in the common specification reflects the mutual action of the PER and the COORD ("hub"). ECF 26-1 (Ex. A) '814 Patent, col. 11:47-58 ("This can be dealt with using mutually agreeable inactivity periods"); 12:35-37 ("The duration field might have been passed during the pairing state, so that the PER and COORD both know and agree on its value.").

Finally, Ozmo argues that because both devices run the WPAN protocol, then any action taken consistent with the protocol can be viewed as "agreement." Ozmo Responsive Br. at 23. The mere fact that both devices run the same protocol does not make instructions from the hub that must be acted on by the second device a series of "agreed" actions. To the contrary, these are simply instructions from the hub, and Ozmo's argument should be rejected.

For these reasons, the Court should adopt Acer's proposed construction.

### H. "Personal Area Network"

The parties agree that a PAN should be a short-range network. See, e.g., Ozmo Responsive Br. at 24 ("Ozmo does not dispute a peripheral network is a short-range network.")  But Ozmo goes on to explain that the notion of short range should not be measured by conventional measures – distance – but rather by the nature of the devices connected to the PAN – "peripheral devices (e.g., a keyboard, a printer, a mouse, and devices that provide visual, audio, and tactile outputs.") The type of devices connected to the hub should be used to define whether something is "short range" or not.

Ozmo argues that the "common specification supports its construction, citing the following language: 'A WPAN is a short-range wireless network, *with typical coverage ranges on the order of 30 feet*, usable to connect peripherals to devices in close proximity." Ozmo Responsive Br. at 23. Inexplicably, Ozmo's construction leaves out the actual range – highlighted in the previous quote – from its construction for the term PAN. While the Court should adopt Acer's proposed

11

construction for the reasons set forth in its opening brief, to the extent that the Court is inclined to adopt Ozmo's proposed construction, it should include the actual range and not just the ambiguous reference to peripheral devices in close proximity.

Turning to transmission power, Acer's proposed construction is not an attempt to read a limitation from the specification into the claim. To the contrary, the specification explains the need for low power to provide the ability to effectively communicate with low powered PERs. Acer Opening Br. at 23-24. Indeed, at one point, the specification explains that the use of low power to preserve battery life is an issue of "paramount importance." ECF 26-1 at 2:67-3:27. Acer's construction gives meaning to the key function of the alleged invention – managing a network of low power devices and allowing them to connect to the broader internet.

Ozmo argues that the power aspect of Acer's construction should be rejected because it is importing an optional aspect of the invention into the claims. Ozmo's Responsive Br. at 24. But Ozmo's citations to the common specification do not support this argument. That certain of the devices in the PAN can be plugged in, for example the printer, while others are not (the mouse) does not change the disclosure that the PAN is a low power network. Nor does the citation regarding a "fixed rate network" say anything about the power level of the WPAN. In short, Ozmo's citations to the common specification do not justify omission of the power level from the construction of WPAN.

Finally, Ozmo argues that the discussion of a solution of the "hidden node" problem from Vleugels I provides support for its argument that the PAN does not have to be low power. Ozmo Responsive Br. at 25, citing ECF 26-8 (Ex. H) at 15:4-9 and 19:48-50). Not so. These passages do not discuss the possibility of a high-powered PAN. Instead, they address a problem that can be caused by a low powered PER device in the PAN – namely that devices in the WLAN (the first

wireless network – not the PAN) may not detect that the PER (low powered device transmitting on the PAN) wants to transmit – or conversely the PER may not detect that the higher power devices using the WLAN want to transmit and that this lack of detection may result in interference. *Id.* Contrary to Ozmo's implication, the stated solution is not to boost the power level required by the WPAN – instead, the claimed hub (COORD in this case) reserves the wireless medium ("WM") for the low power node. *Id.* Because the COORD is also a member of the first network (WLAN) the coordinators reservation would be heard by the devices in the primary network that the PER could not reach. Indeed, Ozmo's further citation to column 19:48-50 confirms that the high-power transmission is an 802.11x transmission – that is a WLAN transmission not a WPAN transmission.

Acer's construction should be adopted.

### I.     "At least partially disable the wireless connection"

This term should be construed to give meaning to what, exactly, it means to "partially disable" the wireless connection. Contrary to Ozmo's arguments, Acer's citations do not cut against their construction. Indeed, the only use of the term "disable" in the patent is where the disabling occurs to save power. ECF 26-1 (Ex. A) '814 Patent at 12:13-18). The same is true for the cited portions from Vleugels I (Acer Opening Br. at 26), which reflects that the logic and/or circuits can be disabled, and the only logical conclusion is that these circuits are turned fully or partially off.

Ozmo also argues that Acer's proposed construction reads out embodiments where the wireless connection is partially disabled to "achieve goals other than the saving of power, such as simply reducing wireless medium occupancy." Ozmo Responsive Br. at 27, citing '814 patent col. 12:20-48. But this argument conflates scheduling transmissions between the COORD and various PERs with disabling some portion of the transmission system when no transmission is scheduled. Indeed, the only part of this passage that relates to something that might be disabled is the sentences

13

that Ozmo omits – "At time $T_0$, the COORD and PERs are programmed to start the frame exchange. If power-save modes are implemented in the COORD or the PERs, a wake-up request will be issued prior to $T_0$, to ensure that all necessary circuits are powered up at $T_0$." ECF 26-1 (Ex. A) '814 Patent col. 12:26-30.

Accordingly, Acer's proposed construction should be adopted.

Dated:  July 28, 2022                                      Respectfully submitted,

By: */s/ Eric H. Findlay*
Eric H. Findlay, Texas Bar No. 00789886
Findlay Craft, P.C.
102 N. College Ave. Suite 900
Tyler, Texas 75702
Tel. (903) 534-1100
Fax: (903) 534-1137
*efindlay@findlaycraft.com*

Craig Kaufman, CA Bar No. 159458
TechKnowledge Law Group LLP
20660 Stevens Creek Blvd., Suite 381
Cupertino, CA 95014
Tel. (650) 517-5200
*ckaufman@tklg-llp.com*

*Counsel for Defendants Acer Inc. and Acer America Corporation*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on July 28, 2022.

*/s/ Eric H. Findlay*
Eric H. Findlay