UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| OZMO LICENSING LLC,<br><br>        Plaintiff,<br><br>v.<br><br>ACER INC. and<br>ACER AMERICA CORPORATION,<br><br>        Defendants. | Civil Action No. 6:21-cv-01225-ADA |

**PLAINTIFF'S SUR-REPLY CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

A. "Logic for processing data received via wireless radio circuit" ('814 patent claim 1 and all asserted dependent claims) ................................................................................................. 1

B. "Logic for generating data to be transmitted by the wireless radio circuit ('814 patent claim 1 and all asserted dependent claims) ................................................................................. 1

C. "Logic for initiating and maintaining wireless network connections with nodes of a wireless network external to the network-enabled hub, maintaining at least a first wireless network connection using a first wireless network protocol and a second wireless network connection using a second wireless network protocol, that can be maintained, at times, simultaneously with each other in a common wireless space, wherein the second wireless network protocol is an overlay protocol with respect to the first wireless network protocol in that communications using the second wireless network protocol are partially consistent with the first wireless network protocol" ('814 patent claim 1 and all asserted dependent claims). 4

D. "Data forwarding logic" ('814 patent claims 1, and all asserted dependent claims; '991 patent claims 1 and 19, and all asserted dependent claims) ........................................................ 5

E. "First [wireless] network/second [wireless] network" ('814 patent claim 1 and all asserted dependent claims; '991 patent claims 1 and all asserted dependent claims) ............................ 6

F. "Overlay Protocol" ('814 patent claim 1; and all asserted dependent claims; '991 patent claims 1 and 19; and all asserted dependent claim; '906 patent claims 1 and 4; and all asserted dependent claims; '934 patent claims 1, 4, and 7; and all asserted dependent claims; '504 patent claims 1, 4, and 7 and all asserted dependent claims) ............................... 7

G. "Partially consistent/partially compliant" ('814 patent claim 1 and all asserted dependent claims; '991 patent claims 1 and 19; and all asserted dependent claims; '906 patent claims 1 and 4; and all asserted dependent claims; '934 patent claims 1, 4, and 7; and all asserted dependent claims; '504 patent claims 1, 4, and 7 and all asserted dependent claims) ............. 9

H. "Configured to agree/can agree/mutually agreeable" ('814 patent claim 5; '991 patent claims 8, 11, 12, 20; '906 patent claims 1, 4; '934 patent claims 1, 4; '504 patent claims 1, 4) ........................................................................................................................................ 11

I. "Personal area network" ('814 patent claims 3, 5; '991 patent claims 11, 19, 20; '906 patent claims 1, 4, 6, 7, 8, 9, 10, 11, 12; '934 patent claims 1, 4, 7, 8, 9; '504 patent claims 1, 4, 7, 8, 9, 12, 14) ........................................................................................................... 12

J. "At least partially disable the wireless connection" ('906 patent claims 1, 4; '934 patent claims 1, 4; '504 patent claims 1, 4) .................................................................................... 14

# TABLE OF AUTHORITIES

**Cases**

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018) .................................................................................................. 10

*Cole v. Kimberly-Clark Corp.*,
  102 F.3d 524 (Fed. Cir. 1996) ...................................................................................................... 5

*Dyfan, LLC v. Target Corporation*,
  28 F.4th 1360 (Fed. Cir 2022) ...................................................................................................... 2

*Envirco Corp. v. Clestra Cleanroom, Inc.*,
  209 F.3d 1360 (Fed. Cir. 2000) .................................................................................................... 5

*In re Katz*,
  639 F.3d 1303 (Fed. Cir. 2011) .................................................................................................... 3

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014) .................................................................................................. 10

*Sage Prods., Inc. v. Devon Indus., Inc.*,
  126 F.3d 1420 (Fed. Cir. 1997) .................................................................................................... 5

*Skky, Inc. v. MindGeek, S.A.R.L.*,
  859 F.3d 1014 (Fed. Cir. 2017) .................................................................................................... 3

*TriMed, Inc. v. Stryker Corp.*,
  514 F.3d 1256 (Fed. Cir. 2008) ................................................................................................ 4, 5

*U.S. Well Services, Inc. v. Halliburton Co.*,
  2022 WL 819548 (W.D. Tex. Jan. 17, 2022) ............................................................................. 10

Plaintiff, Ozmo Licensing LLC ("Ozmo"), submits this Sur-Reply Claim Construction Brief to supplement its Responsive Claim Construction Brief, ECF 29 ("Ozmo Br."), and in response to Acer's Reply Claim Construction Brief, ECF 31 ("Acer Rep. Br.").

In this Sur-Reply, Ozmo modifies its proposed constructions for the terms listed in sections A-C. Where that occurs, Ozmo notes the change with italics and provides an explanation for the change.

### A. "Logic for processing data received via wireless radio circuit" ('814 patent claim 1 and all asserted dependent claims)

| Acer's Proposed Construction | Ozmo's Proposed Construction |
|---|---|
| Means-plus-function limitation | Ordinary meaning (not means-plus-function) |
| Function: processing data received from the wireless circuit | Function: processing data received via the wireless radio circuit |
| Corresponding Structure: Processing Unit 28 (Fig. 6) along with associated software platform 36. | Structure: *Hub (in all claims)*[1]. Also, processing unit 28 coupled to or integrated with wireless circuit *27*[2], software platform 36, and operating system 37 and their equivalents |

and

### B. "Logic for generating data to be transmitted by the wireless radio circuit ('814 patent claim 1 and all asserted dependent claims)

| Acer's Proposed Construction | Ozmo's Proposed Construction |
|---|---|
| Means-plus-function limitation | Ordinary meaning (not means-plus-function) |
| Function: generating data to be sent by the wireless circuit | Function: generating data to be transmitted via the wireless radio circuit |
| Corresponding Structure: Processing Unit 28 (Fig. 6) along with associated software platform 36. | Structure: *Hub (in all claims)*[3]. Also, processing unit 28 coupled to or integrated with wireless circuit *27*[4], software platform 36, and operating system 37, and their equivalents |

---

[1] See discussion below.

[2] Due to an editing error, the listing of structures Ozmo previously submitted incorrectly listed wireless circuit 19 instead of wireless circuit 27.

[3] See discussion below.

[4] Due to an editing error, the listing of structures Ozmo previously submitted incorrectly listed wireless circuit 19 instead of wireless circuit 27.

Acer has asked the Court to rule these two limitations were drafted in means-plus-function ("MPF") format. But because the limitations do not use the word "means," they are presumed not to have been drafted in MPF format. "To overcome this presumption, [Acer has] to show, by a preponderance of the evidence, that persons of ordinary skill in the art would not have understood the ["logic"] limitations to connote structure in light of the claim as a whole." *Dyfan, LLC v. Target Corporation*, 28 F.4th 1360, 1367 (Fed. Cir 2022).

Ozmo cited seven cases from this district and elsewhere holding "logic" may connote sufficiently definite structure and is not a "nonce" or "functional" word that is subject to the limitations of § 112 ¶ 6. Ozmo Br. at 4-5. Acer made no attempt to distinguish most those cases.

Instead, Acer asserted, without explanation, there was "lack of structure in the claim." Acer Rep. Br. at 1. But in these claims "logic" refers to software code and:

> Unlike in the mechanical arts, the specific structure of software code…is partly defined by its function. In determining whether software limitations like those at issue here recite sufficient structure, we can look beyond the initial "code"…term to the functional language to see if a person of ordinary skill would have understood the claim limitation as a whole to connote sufficiently definite structure.

*Dyfan,* 28 F.4th at 1368 (citations omitted).

Ozmo argued *Dyfan, id.,* held "code for" performing a function would connote a class of structures to a person of ordinary skill in the art if that person would have known that the claimed function could be implemented using "off-the-shelf" code. Ozmo Br. at 5. *Acer did not dispute this was Dyfan's holding*. Instead, Acer attempted to distinguish *Dyfan* on its facts by arguing the defendant's expert there had conceded the function could be performed using off-the-shelf code. That distinction, however, does not help Acer, because Acer – not Ozmo – has the burden of proof on this issue. Acer has made no attempt to meet its burden.

Here, the functions are the generic processing and generating of data, among the most basic functions of a processor. In 2006, when the first application for these patents was filed, off-the-shelf software would have been readily available to perform those functions; Acer does not contend otherwise. But if Acer had raised that contention, Acer would have had the burden to show, by a preponderance of the evidence, no such off-the-shelf software was then known to exist. Acer offered no such evidence.

Acer continues to argue these terms (and the term discussed in C, below), even if not drafted as traditional MPF terms are, should nevertheless be treated as MPF terms because the examiner so viewed them during prosecution, and the patent owner was silent as to that issue. Acer Rep. Br. at 1-2. The Federal Circuit takes a different view. In *Skky, Inc. v. MindGeek, S.A.R.L.*, 859 F.3d 1014 (Fed. Cir. 2017), the examiner viewed a claim term ("wireless device means") as an MPF term, and the patentee initially agreed during the patent's prosecution. In a subsequent IPR, the PTAB found otherwise. The Federal Circuit affirmed, agreeing that the term was not an MPF term:

> The Examiner's statements at the time of allowance and [the patentee's] initial agreement do not change that result… [W]e are not bound by the Examiner's or the parties' understanding of the law or the claims. Accordingly, we agree with [the patentee] and the Board that "wireless device means" is not a means-plus-function term under § 112 ¶ 6.

*Id.* at 1020 (citations omitted).

But even if these terms had actually used language creating a presumption the limitation had been drafted in MPF format (e.g., "means for processing, means for generating"), the claims themselves recite a structure that corresponds to these functions: the "hub," defined in the common specification as including a wireless circuit and a processor coupled to that circuit. ECF 26-1 at 3:37-41. *In re Katz*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) held:

3

> [C]laimed functions of 'processing' [and] 'receiving' … can be achieved by any general purpose computer without special programming. As such, it was not necessary to disclose more structure than the general purpose processor that performs those functions … [T]he functions of processing [and] receiving … are coextensive with the structure disclosed, i.e., a general purpose processor.

According to *Katz*, the "hub" is sufficient structure. And because that structure is recited in the claim itself, these limitations are not subject to § 112 ¶ 6. *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259-60 (Fed. Cir. 2008) ("If, in addition to the word 'means' and the functional language, the claim recites sufficient structure for performing the described functions in their entirety, the presumption of § 112 ¶ 6 is overcome – the limitation is not a means-plus-function limitation.").

> C. **"Logic for initiating and maintaining wireless network connections with nodes of a wireless network external to the network-enabled hub, maintaining at least a first wireless network connection using a first wireless network protocol and a second wireless network connection using a second wireless network protocol, that can be maintained, at times, simultaneously with each other in a common wireless space, wherein the second wireless network protocol is an overlay protocol with respect to the first wireless network protocol in that communications using the second wireless network protocol are partially consistent with the first wireless network protocol" ('814 patent claim 1 and all asserted dependent claims)**

| Acer's Proposed Construction | Ozmo's Proposed Construction |
|---|---|
| Means-plus-function limitation | Ordinary meaning (not means-plus-function) |
| *Function*: initiating and maintaining wireless network connection | Function: *initiating and*, at times, *simultaneously maintaining <u>two</u> wireless network connections in a common wireless space* |
| *Corresponding Structure*: Processing Unit 28 (Fig. 6) and wireless circuit 27 along with associated software platform 36. | Structure: *connection with a first network using a first wireless protocol and a connection with a second network using a second wireless protocol that is an overlay protocol of the first wireless protocol where communications using the second wireless protocol are partially consistent with the first protocol.* |
| | Alternatively: Processing unit 28 coupled to or integrated with wireless circuit 27, software platform 36, memory module 29, radio 21, baseband modem 22, control and datapath logic 33, and operating system 37, as well as the methods for "Coordination of Multiple PERs" as |

4

| Acer's Proposed Construction | Ozmo's Proposed Construction |
|---|---|
|  | disclosed FIGs. 11 and 12, and the "Device Discovery" procedures contemplated at 13:16-14:27, and their equivalents |

Acer's identification of the function is wrong. As Ozmo's proposed construction emphasizes[5], the function is not the initiating and maintaining of a single wireless network connection; rather, the function is the initiating and maintaining of *two* wireless network connections, at times, *simultaneously* in a common wireless space.

The structure for performing that function is recited in the claim itself: 1) a connection with a first network using a first wireless protocol and 2) a connection with a second network using a second wireless protocol that is an overlay protocol of the first wireless protocol where communications using the second wireless protocol are partially consistent with the first protocol.

Because the claim itself contains structure to perform the function, the limitation is not in MPF format. *TriMed,* 514 F.3d at 1259-60; *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1996); *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427-28 (Fed. Cir. 1997) ("where a claim recites a function, but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format"); *Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360, 1365 (Fed. Cir. 2000).

D. **"Data forwarding logic" ('814 patent claims 1, and all asserted dependent claims; '991 patent claims 1 and 19, and all asserted dependent claims)**

| Acer's Proposed Construction | Ozmo's Proposed Construction |
|---|---|
| Means-plus-function limitation | Ordinary meaning (not means-plus-function) |

---

[5] The proposed function has been significantly revised from the proposed function in Ozmo's previous brief at 8-9 to distinguish between the language in the claim describing the function and the language describing the structure.
  To simplify the issues, Ozmo has also deleted from the previous heading the portion of the limitation that referred to communications using the second wireless network impinging on antennae used for the first wireless network.

5

| Acer's Proposed Construction | Ozmo's Proposed Construction |
|---|---|
| <u>Function</u>: forwarding data between an originating node connected to one network and a destination node connected to a different network<br><br><u>Corresponding Structure</u>: control/datapath logic 33 (Fig. 6) along with associated software platform 36. | <u>Function</u>: forwarding data between an originating node and a destination node, wherein the originating node is a node in one of the first and second wireless networks and the destination node is a node in the other of the first and second wireless networks<br><br><u>Structure</u>: Software platform 36 (Fig. 6), wireless circuit 27, processing unit 28, memory module 29, radio 21, baseband modem 22, and/or control and datapath logic 33, and their equivalents |

As with the first two limitations, *Acer does not dispute Ozmo's contention, Ozmo Br. at 11, that off-the-shelf software to perform the generic function of forwarding data between networks would have been known to exist in 2006*. That tacit concession should resolve this issue, for the same reasons as set forth in sections A-B above.

Ozmo pointed out Acer contradicted its own position by proposing as corresponding structure "control/data path *logic* 33." Ozmo Br. at 11. Acer does not respond. Similarly, Acer does not respond to Ozmo's argument, *id.*, this limitation was not asserted to be MPF during the prosecution history.

**E. "First [wireless] network/second [wireless] network" ('814 patent claim 1 and all asserted dependent claims; '991 patent claims 1 and all asserted dependent claims)**

| Acer's Proposed Construction | Ozmo's Proposed Construction |
|---|---|
| Two distinct wireless networks | Ordinary meaning |

The claims of the '814 and '991 patents are drawn to a "network-enabled hub," and they recite that the hub is a node that is common to a first and to a second network. The claims also recite the second network uses a protocol that differs from the protocol the first network uses. The claims are readily understandable as describing two networks with overlapping nodes, each with its own protocol. A construction that the two networks are "distinct" would add confusion because it would necessitate a clarification that networks can be "distinct" even if they have overlapping

6

nodes. The Court should thus not instruct the jury on this issue, other than to instruct the claims should be given their ordinary meaning.

**F. "Overlay Protocol" ('814 patent claim 1; and all asserted dependent claims; '991 patent claims 1 and 19; and all asserted dependent claim; '906 patent claims 1 and 4; and all asserted dependent claims; '934 patent claims 1, 4, and 7; and all asserted dependent claims; '504 patent claims 1, 4, and 7 and all asserted dependent claims)**

| Acer's Proposed Construction | Ozmo's Proposed Construction |
| --- | --- |
| A protocol running on a network with at least some distinct components from the underlying network to provide added features | A protocol governing a second network, which protocol has aspects in common with a first network protocol to reduce interference such that the second and first networks can co-exist[6] |

The term to be construed is "overlay *protocol*." That term is discussed extensively in the intrinsic record, in Ozmo's Brief at 12-14, and in citations listed therein. By contrast, Acer appears preoccupied with "overlay *network*," Acer Rep. Br. at 6-7, a term that does not appear in the claims or, for that matter, anywhere in the intrinsic record. Nor did the term "overlay network" appear in Ozmo's Brief.

"Overlay protocol" was defined in Vleugels I, ECF 26-8, an application that was incorporated by reference in the common specification, ECG 26-1 at 1:18-20, and thus forms part of the intrinsic record of the patents. The common specification directs attention to Vleugels I for its explanation of how the two networks can coexist, i.e., maintain association and synchronization: "In one embodiment, the software platform **36** enables circuit **27** to connect to the WPAN, without losing connectivity (such as association and synchronization) to the WLAN, *as described in Vleugels I*." ECF 26-1 at 7:5-9 (emphasis added).

Ozmo's Brief walked through Vleugels I's detailed description of "overlay protocol," with citations to the role of the overlay protocol in enabling "coexistence" of the networks. *See* ECF

---

[6] Ozmo earlier explained, Ozmo Br. at 12, n. 4, this proposed construction differed from the one set forth in Acer's Opening Brief, at 11.

26-8 at 10:18, 10:28-29; Abstract, ll. 2-3, 12. As to Ozmo's proposed construction that the protocol has "aspects in common" with the first network protocol, Vleugels I explained an "overlay protocol…has elements that are *reuses of elements* of a [primary wireless network] protocol," *id.* at 9:39-40, and explained how that feature provides certain advantages, including "the ability to communicate in the [secondary wireless network] without having to disassociate with the [primary wireless network]. *Id.* at 9:42-44. As to reducing interference, Vleugels I explained "an overlay protocol might be such that a [primary wireless network ("PWN")]-only device that hears [a secondary wireless network ("SWN")] packet will be able to…determine how long the wireless medium will be busy with SWN traffic so that the PWN-only device can appropriately defer." *Id.* at 9:47-52.

Acer does not dispute the claimed "overlay protocol" would have some aspects in common with the first network protocol and would be developed by making modifications to the latter. Acer does dispute, however, whether an "overlay protocol" is one that necessarily reduces interference such that the two networks can coexist, although its argument on this point is unclear. Acer does not dispute the common specification describes the use of an overlay protocol "that provides 'coordination'" "[t]o reduce interference." Acer Rep. Br. at 6; ECF 26-1 at 9:65-66. Acer argues only that the specification does not explain how it accomplishes that, Acer Rep. Br. at 6-7, an argument that goes to enablement or written description, not claim construction. But as to that issue, Acer largely ignores the details in Vleugels I supporting that aspect of Ozmo's construction, discussed in Ozmo Br. at 12-15, including the description of the reduction of interference by one network appropriately deferring transmissions until the other network has finished using the wireless medium. ECF 26-8 at Abstract, 9:47-52.

In its Reply Brief, Acer limits its discussion of Vleugels I to a single paragraph. Acer Rep. Br. at 7. That paragraph acknowledges Vleugels I's disclosure that modifications to the underlying WLAN protocol might permit coexistence of the networks by avoiding interference, such as by scheduling transmissions for specific time slots. *Id.* Acer also acknowledges some narrower claims explicitly reference interference reduction. *Id.* at 7-8. Moreover, Acer's Reply Brief does not respond to Ozmo's arguments, Ozmo Br. at 15, that Acer's proposed construction 1) says nothing about the protocol itself; and 2) ignores the requirement in Vleugels I that the protocol must have elements that are reuses of elements in the first network protocol.

Acer concludes its argument as to this term by asserting its proposed construction "is consistent with the usage of the term in the art" – a strange claim, considering its Reply Brief does not give even a single exemplary use of the term "overlay protocol" in the art. The only examples of the use of "overlay protocol" in the record are those Ozmo cited from the intrinsic record, all of which support Ozmo's proposed construction. Ozmo Br. at 13-15.

**G. "Partially consistent/partially compliant" ('814 patent claim 1 and all asserted dependent claims; '991 patent claims 1 and 19; and all asserted dependent claims; '906 patent claims 1 and 4; and all asserted dependent claims; '934 patent claims 1, 4, and 7; and all asserted dependent claims; '504 patent claims 1, 4, and 7 and all asserted dependent claims)**

| Acer's Proposed Construction | Ozmo's Proposed Construction |
|---|---|
| Indefinite | Ordinary meaning<br><br>(The second, overlay protocol conforms to a part, but not to the entirety, of the first wireless network protocol). |

Ozmo has proposed this term be given its ordinary meaning, which, in context, would be that the second, overlay protocol conforms to a part, but not the entirety, of the first wireless network protocol.

9

Acer cites three cases in which the court was confronted with a term of degree, thus raising a boundary issue. *U.S. Well Services, Inc. v. Halliburton Co.*, 2022 WL 819548 (W.D. Tex. Jan. 17, 2022) ("high pressure"); *Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018) ("minimal redundancy"); *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364 (Fed. Cir. 2014) ("unobtrusive manner").

There is no boundary issue here, however, because, as used in this claim, "partially" is a binary term, like "pregnant" or "bankrupt," not a term of degree. That is, if the second protocol conforms to the entirety of the first protocol, it is wholly consistent/compliant, not "partially" consistent/compliant. If, instead, it conforms to anything less than all of the first protocol, it is "partially" consistent/compliant. In the latter case, the claim term would be satisfied, independent of the degree of conformance.

If the term had been used as a term of degree, that would not be the end of the matter: "Claim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention." *Interval Licensing*, 766 F.3d at 1370. Ozmo cited portions of the intrinsic record that gave specific examples in which the modifications to the protocol were those that prevented devices compliant with that modified protocol from interfering with devices compliant with the first protocol (i.e., such that the network using these devices can coexist). Ozmo Br. at 17-21. Thus, even if the term were found to be used as a term of degree, the term remains definite.

"Overlay protocol" and "partially consistent/compliant" are related in the sense that some independent claims use those terms to define each other. For example, claims 1 of the '814 and '991 patents include:

> [T]he second …network protocol is an overlay protocol with respect to the first… network protocol in that communications using the second … network protocol are partially consistent with the first… network protocol.

The terms could be construed together by construing the above clause as including a second network protocol that has aspects in common with a first network protocol to reduce interference such that the two networks can coexist.

**H. "Configured to agree/can agree/mutually agreeable" ('814 patent claim 5; '991 patent claims 8, 11, 12, 20; '906 patent claims 1, 4; '934 patent claims 1, 4; '504 patent claims 1, 4)**

| Acer's Proposed Construction | Ozmo's Proposed Construction |
|---|---|
| The first and second wireless devices jointly determine an inactivity time. | Set up to be able to come to an arrangement or understanding. |

Acer alleges that "[t]he parties' dispute over this term comes down to whether the hub can unilaterally dictate inactivity times, or whether the hub and the second wireless device must agree to a specific inactivity time." Acer Rep. Br. at 10. Acer then goes on to say that Ozmo's proposal is "inconsistent with normal concepts of agreement, *which reflect reaching a common ground or understanding*." *Id.* (emphasis added). Comparing the argument Acer advances with the parties' proposals above, it appears that Acer has conceded that Ozmo's proposal is, in fact, *consistent* "with normal concepts of agreement." This alone should foreclose the issue in favor of Ozmo's proposed construction.

The statement that the devices "agree" on an inactivity period means simply that they are programmed to be inactive for the same period. The devices are programmed to do whatever the WPAN protocol instructs. If the WPAN protocol instructs one device to determine the beginning and duration of an inactivity period, it will instruct the other device to remain inactive during *that* period. That is what is meant by the devices "agreeing." How could it be otherwise?

The claim language reflects this. For instance, claim 1 of the '906 patent, ECF 26-3 at 15:51-53, reads:

11

> the first wireless device and the second wireless device are *configured to agree* on the inactivity time *in accordance with the WPAN protocol*

(emphasis added). "Configured to" is a common claim drafting term meaning "programmed to." In this case, it simply means the inactivity period determined "in accordance with the WPAN protocol" will apply to communications between both devices, i.e., the WPAN protocol instructs both devices to observe the inactivity time, however it is determined.

Acer's argument that "an act ordered by the hub cannot be realistically said to be mutually agreeable" does not even apply to humans. A human ordered to perform an act may agree with the order, in which case the act the human is performing would be "mutually agreeable," notwithstanding it had been ordered. For programmed devices, which simply perform whatever acts they have been programmed to perform, there is even less reason to require some sort of negotiation to reach a "common ground or understanding." They do not "agree" or "disagree," in the sense Acer uses those terms.

Acer's citation of 12:35-37 from the common specification ("The duration field might have been passed during the pairing state, so that the PER and COORD both know and agree on its value"), Acer Rep. Br. at 11, supports Ozmo's construction, by equating the "passing" of the duration field, whichever device might have determined it, with "agreement."

**I. "Personal area network" ('814 patent claims 3, 5; '991 patent claims 11, 19, 20; '906 patent claims 1, 4, 6, 7, 8, 9, 10, 11, 12; '934 patent claims 1, 4, 7, 8, 9; '504 patent claims 1, 4, 7, 8, 9, 12, 14)**

| Acer's Proposed Construction | Ozmo's Proposed Construction |
|---|---|
| A network, different from the local area network (LAN), that has shorter range and lower transmission power. | A short-range wireless network usable to connect peripherals to devices in close proximity. |

"Wireless Personal Area Network" (WPAN) was an established term in the industry well before these patents were filed, used to refer to networks in which communication between a computer or cell phone and its peripherals used a wireless medium to replace cables for short range

12

connectivity. Examples of well-known prior art WPANs (e.g., those using Bluetooth) are described in the common specification. ECF 26-1 at 2:23-35. Although a device in a WPAN could be power sensitive (the common specification, *id.* at 4:37-38, refers to such a device as a "PS-STA"), that was not a requirement. *See id.* at 11:7-8.

As the ordinary meaning of "personal area network" or "WPAN" is broad enough to embrace short range wireless communication between devices that are not power sensitive, the issue here is whether the claims of these patents should be construed to exclude those networks.

Acer's construction is somewhat inexact in describing a *network* as having "lower transmission power." That construction ignores that each transmitting device in the network has its own power level. In a given network, some, but perhaps not all, devices may be power sensitive. This particular scenario is explicitly contemplated in the specification with regards to a wireless printer which may receive power from an external power outlet. *Id.* at 12:3-12. The specification also explains that the "hub," which itself is a node in the WPAN, can be "seamlessly integrated within an electrical power outlet" or "the hub can be a separate device that can be plugged into a power outlet", *id.* at 6:5-9, where the "hub is connected to the power grid, … no batteries are needed to operate the device." *Id.* at 6:63-65. The specification does explain that where a wireless mouse is a second peripheral in the same WPAN as the wireless printer, and where the mouse "operates on battery power[,]" then it may be the case that "both peripherals *might* use the same power-saving protocol." *Id.* But there is nothing in the specification that requires such, particularly in a scenario where the wireless mouse may leave the WPAN such that the wireless printer, then the only remaining "PER" device, is not concerned with power dissipation. Where that printer is connected to a hub, such as a desktop computer, via the WPAN, then neither node in the WPAN

13

is necessarily concerned with power dissipation. *Id.* at 11:7-15. Presumably, Acer is asking for a construction that would exclude a network that did not contain a power sensitive device.

But the benefits of the invention are not limited to networks with a power sensitive device. As Ozmo has explained, Ozmo Br. at 1, the patents teach improved systems and methods for integrating a WPAN into a WLAN infrastructure by minimizing interference between the networks, as well as by reducing other problems arising from previous integrations. Those problems were not limited to power dissipation; they also included lack of synchronization, low transmission rates, and latency in communications. There would thus be no reason to arbitrarily exclude from the patents a network that adopts the patents' communication protocols simply because the network did not include a power sensitive device.

The common specification confirms the breadth of the invention. Ozmo cited sections of the common specification that described embodiments that conflict with Acer's construction, Ozmo Br. at 24, such as ECF 26-1 at 11:7-8, which states that low-power PERs are "not always required" for the invention and giving as an example a network consisting of a laptop and a printer. *Id.* at 12:6-9.

Acer's construction ignores that WPANs are generally fluid, in the sense that a given device may join or drop off the network, as the need arises. If the Court were to adopt Acer's construction, the departure of a power sensitive device might cause a network to lose its status as a WPAN, and thus to fall outside WPAN claims, even though its communication protocol has not changed.

### J. "At least partially disable the wireless connection" ('906 patent claims 1, 4; '934 patent claims 1, 4; '504 patent claims 1, 4)

| Acer's Proposed Construction | Ozmo's Proposed Construction |
|---|---|
| Turn off a portion of the wireless circuit to save power. | Ordinary meaning |

|  | (To make at least part of the wireless connection inactive.) |
|---|---|

The "wireless connection" in these claims is between two devices using a WPAN protocol, where each device is a member of a WPAN network, and the two devices are configured to "at least partially disable" that connection. *See, e.g.*, ECF 26-4 at 15:51-53.

The intrinsic record discloses options other than "turning off a portion of the wireless circuit" to partially disable that connection. Vleugels I describes "disabl[ing] at least part of the *logic*… at the start of an inactivity time" as an alternative to disabling at least part of the… *circuitry*." ECF 26-8 at 15:20-23 (emphasis added). Further, logic may be disabled without turning it (or the wireless circuit) off. *See, e.g.*, ECF 26-1 at 5:27-30 (explaining "a PS-STA is typically in a sleep mode the majority of the time, only waking up occasionally to communicate and exchange information with the outside world."). *See also id.* at 3:24-28, 8:19-29. That Acer's construction would exclude these embodiments where a device is not turned off (nor is any component of that device turned off), but rather is put into a "power save" or "sleep" mode is ample reason to reject Acer's construction.

Depending on circumstances, disabling the logic or circuitry may "save power," but that is a feature added by dependent claims. *Compare* ECF 26-4 at 15:8-59 ('934 patent claim 1) *with id.* at 15:60-63 ('934 patent claim 2); *compare* ECF 26-5 at 15:19-16:3 ('504 patent claim 1) *with id.* at 16:4-7 ('504 patent claim 2). The doctrine of claim differentiation would thus discourage reading that limitation into the broader claims that do not require it.

Dated: August 12, 2022                Respectfully Submitted,

                                              */s/ Karl Rupp*
KARL RUPP
State Bar No. 24035243
**SOREY & HOOVER, LLP**
100 N. 6th Street, Ste. 502
Waco, Texas 76701
903.230.5600 (telephone)
903.230.5656 (facsimile)
krupp@soreylaw.com

James J. Foster
jfoster@princelobel.com
Matthew D. Vella
mvella@princelobel.com
Robert R. Gilman
rgilman@princelobel.com
Aaron S. Jacobs
ajacobs@princelobel.com
Alyssa H. Ruderman
aruderman@princelobel.com
**PRINCE LOBEL TYE LLP**
One International Place, Suite 3700
Boston, MA 02110
Tel: (617) 456-8000

*COUNSEL for PLAINTIFF*

## **CERTIFICATE OF SERVICE**

       I hereby certify that a true and correct copy of the above document has been delivered to all counsel of record through the Court's CM/ECF service on this 12th day of August, 2022.

                                              */s/ Karl Rupp*